**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| URSACK, Incorporated, JACQUELINE FLORINE, GARY FISHER, and PHOENIX VAMVAKIAS,<br><br>               Plaintiffs,<br><br>   v.<br><br>SIERRA INTERAGENCY BLACK BEAR GROUP; NATIONAL PARK SERVICE; UNITED STATES FOREST SERVICE; SEQUOIA & KINGS CANYON NATIONAL PARKS; CRAIG AXTELL, Superintendent; YOSEMITE NATIONAL PARK; MICHAEL TOLLEFSON, Superintendent; INYO NATIONAL FOREST; JIM UPCHURCH, Forest Supervisor,<br><br>               Defendants. | No. 08-1808 SC<br><br>ORDER RE: CROSS-MOTIONS FOR SUMMARY <u>JUDGMENT</u> |

I.   **INTRODUCTION**

This suit arises from the Sierra Interagency Black Bear Group's ("SIBBG") decision to withdraw conditional approval of a particular soft-sided, bear-resistant canister, effective in portions of national parks and forests located in the Sierra-Nevada Crest (the "Sierras").   Now before the Court is a Motion for Summary Judgment, brought by Plaintiff Ursack, Incorporated ("Ursack"), together with Jacqueline Florine, Gary Fisher, and Phoenix Vamvakias (collectively, "Individual Plaintiffs").   Docket No. 30 ("Ursack Motion").   A Cross-Motion for Summary Judgment has

**United States District Court**
For the Northern District of California

1  been filed by Defendants, including SIBBG, the National Park

2  Service ("NPS"), the United States Forest Service ("USFS"),

3  Sequoia and Kings Canyon National Parks ("SEKI"), Craig Axtell as

4  Superintendent for SEKI, Yosemite National Park ("Yosemite"),

5  Michael Tollefson as Superintendent for Yosemite, Inyo National

6  Forest ("Inyo"), and Jim Upchurch as Forest Supervisor for Inyo

7  (collectively, "Defendants").  Docket No. 36 ("Defendants'

8  Motion").  Plaintiffs and Defendants both submitted Replies.

9  Docket Nos. 39 ("Ursack Reply"), 43 ("Defendants' Reply").[1]

10  Having considered the papers filed by both parties, the Court

11  GRANTS Defendants' Motion and DENIES Ursack's Motion.

12

13  **II.   BACKGROUND**

14      **A.   Regulations Relating to Bear-Resistant Containers**

15      The NPS is charged with the duty of administering and

16  conserving the National Parks (including Yosemite and SEKI), and

17  to conserve "the wildlife therein and to provide for the enjoyment

18  of the same in such a manner and by such means as will leave them

19  unimpaired for the enjoyment of future generations."  16 U.S.C.

20  § 1.  Similarly, the USFS exists to regulate the "occupancy and

21  use" of public forests (like Inyo), and "to preserve the forests

22  thereon from destruction."  16 U.S.C. § 551.  To this end, both

23  agencies are involved in managing the interaction between humans

24  and black bears.  To more effectively address common issues, the

25

26      [1] Defendants submitted a stipulation and request for leave to
file a reply that exceeds the required page limit.  Docket No. 41.

27  The Court hereby GRANTS this request.

28

United States District Court
For the Northern District of California

Superintendents of Yosemite and SEKI and the Forest Supervisor of Inyo entered into a Memorandum of Understanding in May of 2001, creating SIBBG "to share information, techniques, and ideas; to coordinate policies and information; and to eliminate political barriers to progress -- all with the ultimate goal of preserving a healthy black bear population free of human influences on a regional scale." SIBBG at 3.[2] The agency consists of members from key positions in Yosemite, SEKI, and Inyo. <u>Id.</u> at 3-4. One of SIBBG's key directives is to "adopt uniform testing standards and approval protocols for SIBBG approved bear-resistant food storage containers." <u>Id.</u> at 3.

A "bear-resistant food storage container" is just what it sounds like: a portable container that is designed for use by hikers and backpackers, designed to protect their food and garbage from curious or hungry bears.  Bear-resistant containers are typically hard-sided cans or jars that weigh between two and three pounds.  SIBBG at 308-09.  While these canisters provide visitors with more freedom than do the stationary storage lockers that can be found at various points in the parks and forest, many backpackers find their weight and bulk to be cumbersome.  <u>Id.</u> at 683.  Nevertheless, there are a number of obvious reasons why a backpacker may wish to use a bear-resistant container, and why the parks and forest wish to regulate them -- including a desire to

---

[2] The Administrative Record for the decision at issue is divided into four parts, corresponding to the SIBBG and the individual parks or forest that were involved in the decision (YOSE, SEKI, and INYO).  Throughout this order, citations to the Administrative Record will consist of the name of the agency, followed by a page number (e.g., YOSE at 112).

3

**United States District Court**
For the Northern District of California

keep individual bears from becoming conditioned to human food.
Conditioned bears may alter their behavior, and begin habitually
visiting camp sites to forage through belongings in search of
food.  See INYO at 4-6.  Once a bear becomes conditioned, it may
increase its contact with humans, which poses a risk to people and
could eventually lead to euthanization of the bear.  See YOSE at
278-79; SEKI at 354; INYO at 4-6.  It is not clear how much
anthropogenic food is necessary to make a wild bear into a
"problem bear;" it could take several encounters, or perhaps just
a taste or smell of human food.  SIBBG at 527.

        To better keep human food away from bears, SIBBG has created
and refined a protocol for testing and evaluating bear-resistant
containers.  Id. at 711-749.  SIBBG uses this protocol to grant
approvals to containers that it deems effective.  Id.  These
approvals are essentially recommendations to NPS and USFS
officials, who have the legal authority to make final
determinations as to which containers will be allowed in the
"restricted areas" of particular national parks or forests.  See
Defs.' Mot. at 18; SIBBG at 846, 852.  As such, certain parks and
forests may be more or less restrictive than others.  See, e.g.,
YOSE at 185.  In April of 2004, the use of approved canisters
became mandatory in certain areas of Yosemite, namely, any place
within 7 miles of a roadway, or anywhere above the tree line
(about 1.8 miles in elevation).  YOSE at 269; SIBBG at 646.
Yosemite also prohibited the practice of suspending food from
trees (i.e., the "counterbalance method") in the canister-only
areas.  YOSE at 269.  That same year, SEKI issued requirements

**United States District Court**
For the Northern District of California

that food in certain designated areas be stored in approved canisters, and also prohibited the counterbalance method in those areas. SEKI at 253-54. Inyo has also issued forest orders that require visitors to use approved containers at certain times and in certain places within Inyo. INYO at 4-18.

The Sierras are popular destinations for campers and backpackers. Yosemite alone drew an estimated 80,000 people for overnight use in 2003. SIBBG at 643. As Yosemite, SEKI and Inyo officials appear to give great weight to SIBBG's approvals, SIBBG's determinations can have a substantial economic impact on the manufacturers of bear-resistant canisters. For example, Ursack has contended that the nationwide retailer REI will only carry products that are approved by SIBBG. Id. at 308. Manufacturers of bear-resistant containers, like Ursack, therefore have a strong financial incentive to win SIBBG's approval for their products.

**B.    The Development and History of the Ursack S29 Hybrid**

Since 2001, Ursack has manufactured and sold a number of different soft-sided, bear-resistant containers called "Ursacks," which have been made from a variety of "bullet proof" fabrics including Kevlar, Vectran and Spectra. Ursack Mot. at 1-2. The Ursacks were originally designed to be tied to trees, to prevent bears from crushing the contents. SIBBG at 530. In contrast to the two-to-three pound, hard-sided containers, Ursacks weigh only eight ounces, and their light weight has made them attractive to backpackers who prefer to travel light. SIBBG at 309, 525. The earliest Kevlar models were apparently successful in tests

5

United States District Court
For the Northern District of California

performed using captive bears, and SIBBG granted these conditional approval in 2001. YOSE at 187. However, approval of the early models proved to be "somewhat disastrous." SIBBG at 526. When the Ursacks were used in the field, bears repeatedly gained access to their contents by tearing through the seams or fabric. YOSE at 187. In late 2003, Ursack began producing bags made of Spectra, which were stronger than the Kevlar models, and which were accompanied by aluminum inserts that wrapped around the bag's contents to offer more protection. Id. at 188. This product, referred to variously as the Ursack TKO, S29 (a reference to its 29 yarns-per-inch) or S29 Hybrid (a reference to the aluminum insert), is the container at issue in this litigation.

On October 24, 2003, SIBBG members voted to test extensively the S29. Id. at 189; SIBBG at 767. SIBBG designed a rigorous testing protocol to address a number of concerns related to the Ursacks, including:

a)  Bag may leak food through puncture holes;
b)  Bag integrity may decrease with successive bear encounters;
c)  Marmots or other rodents may compromise the integrity of the bags;
d)  Bags which are properly secured may cause damage to trees;
e)  Bags which are not adequately secured may be carried off and become wilderness litter that will be very slow to deteriorate;
f)  Users may need to cut cord because the knots have become too tight to untie after being pulled on by a bear, eliminating the users' ability to secure the bag;
g)  The bag cannot be secured adequately above [the] tree line;
h)  The bag can easily be used correctly as prescribed by the manufacturer or in accordance with any special Federal requirements.

**United States District Court**
For the Northern District of California

SIBBG 525-26.

The S29 performed well in the ensuing tests, which involved leaving baited Ursacks in areas with known "problem" bears. <u>Id.</u> at 544. For the most part, the Spectra held up, and only suffered from numerous micropunctures that apparently did not weaken the surrounding fabric. <u>Id.</u> Leakage of solid food through the micropunctures appeared to be "insignificant,"[3] although liquids stored in the Ursacks apparently leaked as its packaging was destroyed. <u>Id.</u> Some kind of rodent (probably a mouse) was able to chew a hole through two of the S29s, but no bear was able to access the solid food. <u>Id.</u> at 544.

Even though the bags succeeded in keeping bears away from the food, most of the food was "mutilated," or was rendered inedible after being mixed with bear slobber, which partially digested the food and gave it a noxious odor. <u>Id.</u> at 544, 558-59. This also posed at least a speculative risk for rabies. <u>Id.</u> The aluminum added some protection, but in some instances it was crushed or torn, and dangerous metal fragments got mixed into the food. <u>Id.</u> at 558. The study's author expressed two concerns with the condition of the food. First, backpackers may choose to dump, rather than carry out, the mutilated food, thereby allowing bears access to anthropogenic food and defeating the container's primary purpose. <u>Id.</u> at 564. Second, if a backpacker witnesses a confrontation between a bear and an Ursack, the backpacker may

---

[3] The study's author later qualified this characterization: "Whether this small loss of food would be sufficient to effect [sic] future behavior of bears that are not yet conditioned to human food is unknown for the Sierra Nevada." SIBBG at 553.

7

**United States District Court**
For the Northern District of California

1   attempt to frighten the bear away to save the food, rather than

2   allow the bear have its way with the container.  Id.  This could

3   endanger the backpacker, who presumably would not interfere if the

4   bear was interacting with a hard-sided container that could better

5   protect the food from mutilation and bear slobber.  Id.

6       The test also addressed environmental concerns.  To test

7   whether bears may carry away the Ursacks, resulting in non-

8   biodegradable litter, several Ursacks were intentionally left

9   untied to trees or rocks.  Id. at 545.  The bears in the tests

10  apparently did not carry these units very far (the furthest having

11  been carried as far as sixty-seven meters).  Id.  However, where

12  the bags were tied to trees, the trees tended to experience some

13  degree of damage to their bark, and the substrate around the

14  Ursacks was also generally disturbed.  Id. at 545, 560-62.

15      On October 16, 2004, roughly a month after the study was

16  complete, SIBBG voted to deny conditional approval of the S29.

17  YOSE at 117.  In a letter to Ursack, the NPS explained that the

18  S29 damaged the natural environment, presented a threat of human

19  injury, and created a risk that Ursack users may dump their

20  mutilated food.  Id. at 117-18.  The letter explained that Ursack

21  users would remain free to use the bags in areas that were not

22  subject to the canister-only requirements.  Id. at 118.

23      In early 2005, Ursack produced a new "heavy-duty" or

24  "reinforced" insert, which was intended to cure some of the

25  defects that were apparent from the previous year's study.  Id. at

26  188, 190.  However, in 2005 the U.S. military requisitioned all

27  available Spectra, which became unavailable for civilian use.  Id.

28

8

This forced Ursack to use Vectran as a fabric, and it produced the "V21" model instead of the S29 during 2005 and 2006.  Id. at 188. The V21 was not heavily tested in 2005, but it was conditionally approved for use in 2006.  Id. at 188-89.  Unfortunately, the Vectran proved ineffective.  After numerous reports of incidents in which bears were able to access food from V21s, SIBBG pulled conditional approval on October 12, 2006.  Id. at 189-90.  By this time there was a "general dislike for the product" among at least the Yosemite members of SIBBG.  SIBBG at 452.  After extensive discussions, SIBBG eventually decided to further consider the "V27" (another Vectran model using a denser weave) and the S29, but would subject these to further in-house testing, rather than grant conditional approval.[4]  YOSE at 189-90.  The NPS notified Ursack of this decision via a letter dated January 25, 2007. SIBBG at 16-17.

Of course, if SIBBG only allowed in-house testing of the S29, this would mean that the public could not use it in restricted areas during 2007.  Ursack would therefore lose significant appeal to potential customers who intended to use these restricted areas. Tom Cohen ("Cohen"), an inventor of the Ursack and the person running the company, contacted SEKI employee and SIBBG member Harold Werner ("Werner"), who invited Cohen to attend SIBBG's 2007 spring meeting.  Id. at 224.  Although Cohen attended the meeting, SIBBG did not change its decision.  Id. at 458.  On March 19,

---

[4] Ursack discontinued the V27s because of the renewed availability of Spectra, apparently before any further testing had occurred.  Ursack Reply at 2 n.3.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

2007, Cohen sent a letter to Barbara Goodyear, the Field Solicitor for the U.S. Department of Interior, requesting a "pre-litigation meeting" and threatening that, "[u]nless Ursack is promptly provided with a rational basis for SIBBG's decision, it would seem that a preliminary injunction is the only way to save our selling season." YOSE at 23-26.

On March 23, 2007, in response to Cohen's letter, the Superintendent of SEKI suggested that the other members of SIBBG conditionally approve the S29, subject to a number of conditions, including 1) the bags could not be tied to trees or rocks (i.e., they had to be placed on the ground like any other approved bear-resistant container); and 2) if there were two or three reported failures, the product would lose its conditional approval. SEKI at 184-85. On April 10, 2007, members of SIBBG conferred and agreed to conditionally approve the S29, provided that the approval be recalled if three or more containers fail during the 2007 field season. YOSE at 191-92. SIBBG also cancelled the planned in-house testing. Id. This decision was discussed with Ursack at a meeting on May 9, 2007. YOSE at 146, 149.

Time passed, and visitors used the S29s throughout the 2007 summer season. After the season ended, SIBBG met to discuss a total of nineteen "bear incidents" that had involved S29s, including six alleged "failures." SIBBG at 461-62. The SIBBG members unanimously voted to remove conditional approval of the S29. Id. This decision was transmitted to Ursack by a letter dated November 27, 2007, which cited the S29's "disproportionately high failure rate" as the primary reason for rescinding

10

United States District Court

For the Northern District of California

conditional approval.  YOSE at 163-172.

SIBBG's decision to rescind conditional approval of the S29 is the subject of the current suit.  Plaintiffs contend that the decision was arbitrary and capricious, and that SIBBG violated the Administrative Procedures Act ("APA") as well as Ursack's due process rights and its right to equal protection under the law.  See Ursack Mot. at 12, 15, 17.  Plaintiffs further contend that SIBBG is an "advisory committee" that operates in violation of the Federal Advisory Committee Act ("FACA").  Compl., Docket No. 1, § 79.

## III.  **LEGAL STANDARD**

### A.    **Summary Judgment**

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure may be granted where the pleadings and materials on file show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Where a case involves review of a final agency determination under the APA, 5 U.S.C. § 706, resolution generally "does not require fact finding on behalf of [a] court."  Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994); see also Wilderness Soc'y v. Bosworth, 118 F. Supp. 2d 1082, 1089 (D. Mont. 2000) ("Summary judgment is a particularly appropriate means of resolving claims against forest management decisions by the U.S. Forest Service.").  As the scope of review is confined, by and large, to the administrative record, this case presents no questions of material fact that would render

it inappropriate for resolution by summary judgment.

   **B.   Scope of Review Under the APA**

        Judicial review of an agency's final determination is governed by the APA.  See 5 U.S.C. § 706; Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  An agency action is improper if it is "contrary to [a] constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  In addition, a reviewing court must "hold unlawful and set aside" an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Thomas Jefferson Univ., 512 U.S. at 512.  An agency's determination is arbitrary or capricious if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). However, "[t]he court is not empowered to substitute its judgment for that of the agency," and may only determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).  A court's deference to an agency "is especially appropriate where the challenged decision implicates substantial agency expertise." Mount Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571 (9th Cir. 1993).

United States District Court
For the Northern District of California

IV.   **DISCUSSION**

A.   **Defendants' Motion to Strike**

The Court first addresses Defendants' Motion to Strike, which relates to three items submitted by Plaintiffs in support of their Motion for Summary Judgment:  1) a Request for Judicial Notice ("RJN"); 2) a declaration submitted by Cohen; and 3) a Statement of Undisputed Facts ("SUF").  Docket Nos. 31, 32, 34.  Defendants filed a motion to strike these items as material that falls outside of the administrative record.  Docket No. 35.

In general, a Court's review of a final administrative action under the APA is limited to the administrative record.  As stated by the Supreme Court in Florida Power & Light Co. v. Lorion:

> "[The] focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.

470 U.S. 729, 743-44 (1985) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)).  Courts in the Ninth Circuit have recognized numerous exceptions to this general rule, particularly where extra-record information is used to determine whether an agency considered all of the relevant factors, to explain an agency determination, or to determine whether an agency's "course of inquiry was insufficient or inadequate."  Alpine Lakes Protection Society v. U.S. Forest Serv., 838 F. Supp. 478, 481 (W.D. Wash. 1993); see also Hells Canyon Pres. Council v. Jacoby, 9 F. Supp. 2d 1216, 1223 (D. Or. 1998) (collecting cases).

Plaintiffs request judicial notice of three facts.  The first

two are items posted on the NPS web site, which provide relevant background information that may shed light on the context of SIBBG's decision.  See RJN ¶¶ 1-2.  Because these facts are not subject to reasonable dispute, and are capable of determination using sources whose accuracy cannot reasonably be questioned, the Court may take judicial notice of them.  See New Mexico ex rel. Richardson v. BLM, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of data on web sites of federal agencies).  The first fact relates to the number of "reported bear incidents" in Yosemite as of October 13, 2007 (456, of which only 33 happened in the wilderness).  Id. ¶ 1.  The second fact evidences that one S29 "failure" that took place during the 2007 testing season occurred in an area where only metal storage bear boxes could be used (i.e., canisters of any kind were disallowed).  Id. ¶ 2.  The Court notes that this information was readily available to the decision makers when making the determination at issue.  As such, these facts could potentially help explain the decision, or show that the agency failed to consider a factor, and the Court takes judicial notice of them.

Plaintiffs also ask the Court to take judicial notice of the patent for the Ursack bag, to show that it was designed to be tied to a tree.  RJN ¶ 3.  There is no evidence that the patent itself was before SIBBG, the NPS or USFS, and the Court sees no need to supplement the record with information not before the agencies.

The Court declines to take judicial notice of the patent.[5]

The Court GRANTS Defendants' motion to strike portions of Cohen's declaration that are not based upon the administrative record.  The declaration contains information related to Ursack's revenue and the impact of SIBBG's determinations, information related to Cohen's personal investigation into several of the alleged S29 failures in 2007,[6] and information on Ursack's in-house tests.  Cohen Decl. ¶¶ 2-5.  The Court does not find that this extra-record information illuminates or explains SIBBG's decisions.  Where information in the declaration was clearly made known to SIBBG, the Court will still consider the record, see, e.g., SIBBG at 167-69 (Cohen's e-mail to SIBBG member regarding investigation into alleged failure), but not the declaration.

Finally, the Court declines to strike Plaintiffs' SUF, as this document simply repeats arguments and characterizations found in Plaintiffs' Motion.  The Court will accept the SUF as true only where it is grounded in the record.  As such, the Court's decision to not strike the SUF has no impact on the outcome of these Motions.

**B.   <u>Standing</u>**

Individual Plaintiffs are each backpackers who express a

---

[5] Doing so makes no difference to the outcome of the Court's determination.  The fact that Ursacks were originally intended to be tied to trees, and had to be redesigned to accommodate SIBBG's concerns, is adequately reflected in the administrative record.  See, e.g., SIBBG at 530, 789, 933-34.

[6] To the extent that Plaintiffs merely wish to raise the point that SIBBG never gave them a chance to contest the alleged failures, they need not submit to this Court the evidence that they would use to directly refute those failures.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

desire to use Ursacks in restricted areas.  Compl. ¶¶ 11-16.

Defendants challenge the standing of the Individual Plaintiffs, on

the basis that the Individual Plaintiffs have not adequately

articulated or proven a basis for standing.  Defs.' Mot. at 22-23.

Defendants do not challenge the standing of Ursack, which has an

obvious financial stake in SIBBG's determination and the outcome

of this litigation.  The Individual Plaintiffs are represented by

the same counsel as Ursack, and have not submitted separate briefs

or made any separate arguments.  Their presence has no bearing on

the outcome of this Motion.  Because Ursack has clear and

uncontested standing to challenge SIBBG's determination, the Court

declines to inquire into the basis for the standing of the

Individual Plaintiffs.  See Arlington Heights v. Metro. Hous. Dev.

Corp., 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of

this plaintiff, we need not consider whether the other individual

and corporate plaintiffs have standing to maintain the suit.");

County of Okanogan v. Nat'l Marine Fisheries Serv., 347 F.3d 1081,

1084 (9th Cir. 2003) ("Whatever questions exist as to the standing

of the various appellants, they are represented by the same

counsel and make the same arguments, and [one appellant] . . .

indisputably has standing.  We accordingly proceed to the

merits.").

    **C.**    **Whether SIBBG's Determinations Were Arbitrary or Capricious**

Plaintiffs contend that SIBBG arbitrarily and capriciously

"banned" Ursack by withdrawing its conditional approval after the

2007 summer season.  Ursack Mot. at 12-15.  Throughout its briefs,

16

**United States District Court**
For the Northern District of California

Plaintiffs raise a number of different arguments to characterize SIBBG's determination as arbitrary and capricious, and the Court addresses each in turn below.

### 1.   The "Three-Failures" Standard

Plaintiffs first contend that SIBBG acted arbitrarily and capriciously by concluding that conditional approval of the S29 would be rescinded if there were three reported failures of the model during the 2007 field season. <u>Id.</u> at 12-13; YOSE at 192. Plaintiffs claim that "there was no reasoned analysis among its members, no scientific basis for selecting the number three . . . no input from the public . . . ." Ursack Mot. at 12. According to Plaintiffs, this decision was particularly arbitrary because the BearVault, a competing hard-sided container, failed twelve or thirteen times in 2005 without being banned. <u>Id.</u> at 13.

The Court concludes that it was not arbitrary or capricious for SIBBG to pick a fixed number of failures that would trigger revocation of conditional approval. The record reflects that SIBBG had previously set fixed targets for earlier Ursack models, because Ursack had explicitly requested a fixed standard for approval. <u>See</u>, <u>e.g.</u>, SIBBG at 817-18, 825-26, 865. These numbers were typically very low; for example, in 2002, the conditions were set at three failures where bags were used correctly, or five where bags were used incorrectly. <u>Id.</u> at 819-20. The record also reflects SIBBG's reasons for setting the number so low. Shortly after Ursack began its contact with SIBBG, Cohen complained about what he characterized as a "100% success rate" requirement. <u>Id.</u> at 808. SIBBG responded as follows:

17

> We agree that 100% success is impossible, but [the Ursack's] rate of failure is unacceptable.  It only takes one incident of a bear getting human food to potentially change its behavior.  We currently have hundreds of people in SIBBG areas every week using hard-sided canisters without complaint or failure.

Id. at 816.  In other words, SIBBG set the number of failures low because 1) it deemed each failure to have real consequences, which posed risks for both bears and humans, and 2) the bar was set high by the hard-sided canisters already in use.

Nor was it arbitrary or capricious to set the number far lower than the number of times that the BearVault failed in 2005.  The administrative record relevant to BearVault is not before the Court, however, minutes from the SIBBG meeting in the fall of 2005 state that there were eleven or twelve BearVault failures in SEKI, and one additional failure in Yosemite.  Id. at 789.  Cohen raised the issue of the failing BearVaults in an e-mail to Werner dated October 7, 2005.  Id. at 950-51.  Werner responded:

> We did not pull the approval on the BearVault because all of the problems were focused on a small area suggesting that one bear figured out how to break into them.  If those same incidents were spread over a large area indicating a fundamental problem with the design or the way people use it, I suspect that we would have pulled their approval.  The protocol leaves SIBBG a lot of room for applying common sense.

Id. at 949.  Indeed, at SIBBG's spring meeting in 2007, the group concluded that, if there was one more failure outside of Rae Lake (the "small area" in question), the approval for the BearVault would be pulled.  Id. at 458.  In light of this rationale, if SIBBG had rescinded its conditional approval of the S29 based solely on three failures in a single location, then the Court may

18

agree that treatment of the S29 was capricious.  However, SIBBG

rescinded conditional approval after six recorded failures spread

throughout the region.  Id. at 301-302.[7]  SIBBG's decision to

withhold the forbearance that it had shown BearVault was therefore

reasonable, as the basis for that forbearance simply did not apply

to the Ursack.

Finally, when SIBBG actually rescinded conditional approval

of the Ursacks, the letter notifying Ursack of the revocation,

sent by the Solicitor for the Department of Interior on November

27, 2007, provided an independent justification for revocation,

besides the absolute number of reported failures.  The letter

stated that the Ursacks' rate of failure was also a significant

basis for determination:

> Compared to other portable food-storage devices,
> Ursacks were rarely observed (3% of documented use
> at Sequoia and Kings Canyon National Parks, n =
> 476).  Since only one failure was reported for all
> other portable food-storage units within areas
> managed by SIBBG members, the Ursack had a
> disproportionately high failure rate.

YOSE at 163.  This indicates that the three-failure standard was

not the sole basis for revocation.  Even if the number three had

---

[7] The record from the October 24, 2007 SIBBG meeting actually
lists seven "failures," but includes an incident on July 30, 2007,
in which a bear spent five minutes with an Ursack before it was
chased away by a camper wielding a hiking pole.  SIBBG at 302.  The
bear received no food, and the Ursack had only small tooth holes.
Id.  When SIBBG notified Ursack of the revocation by letter, it
attached a list of the six failures, including the July 30
incident.  YOSE at 165.  Defendants have explained that the July
30, 2007 incident was inadvertently included on the list, but
another reported failure, which occurred in August in Inyo, was
excluded.  Defs.' Mot at 7 n.3.  Defendants base their decision on
the six reported failures excluding the incident on July 30, 2007.
Id.

**United States District Court**
For the Northern District of California

1    not been a rational and scientifically-chosen figure, there

2    existed a separate rational basis for rescinding approval: Ursack

3    performed significantly worse than did other available canisters.

4    <u>Id.</u>  The Court finds that SIBBG did not act arbitrarily or

5    capriciously when it set or applied the three-failures standard.

6             **2.   SIBBG's Consideration of the Issue of Compliance**

7         Plaintiffs make a strong argument for approving the Ursack:

8    The primary cause of bear-related incidents is not cannister

9    failure, but visitor noncompliance with food-storage requirements.

10   <u>See</u> Ursack Mot. at 3.  Many backpackers dislike cumbersome hard-

11   sided containers, and may not bother to use a container at all; at

12   the same time, because most containers are cumbersome and heavy,

13   it is unlikely that even well-meaning backpackers will bring more

14   than one, and many visitors may therefore have "overflow" food.

15   <u>See</u> SIBBG at 683.  Unlike hard-sided containers, Ursacks are

16   collapsible and relatively light.  <u>Id.</u> at 309.  Therefore, even if

17   the S29 has a high failure rate, its availability could make

18   backpackers more willing to bring and use a bear-proof container -

19   - or even a second container to prevent overflow.  Plaintiffs

20   contend that "there is no indication in the [administrative

21   record] that SIBBG ever considered this most important factor in

22   establishing its criteria for Ursack," therefore the decision was

23   arbitrary and capricious.  Ursack Reply at 8-9; <u>see also</u> <u>American</u>

24   <u>Horse Protection Ass'n v. Lyng</u>, 812 F.2d 1, 6-7 (D.C. Cir. 1987)

25   (overturning agency determination where agency failed to consider

26   significant aspect of problem agency was trying to address).

27        The Court agrees that the compliance consideration is

28                                    20

significant -- however, the Court may not substitute its judgment for that of the agency.  The Court must instead determine whether SIBBG's conclusion was "based on a consideration of the relevant factors and whether there has been a clear error of judgment."  <u>Overton Park</u>, 401 U.S. at 416.  "As long as the agency gives fair consideration to the relevant factors mandated by law, the importance and weight to be ascribed to those factors is the type of judgment that courts are not in a position to make."  <u>Florida Manufactured Hous. Ass'n v. Cisneros</u>, 53 F.3d 1565, 1577 (11th Cir. 1995).  The question before the Court is therefore:  Did SIBBG ignore the important consideration of visitor compliance?  Or did it consider this factor and nonetheless declined to allow the use of Ursacks because of countervailing concerns?

The record reflects that SIBBG members clearly saw the advantage that Ursacks offered over other products, and explicitly considered the impact that Ursacks might have on visitor compliance with food-storage requirements.  SIBBG had previously told Ursack that "[o]ur wilderness users, our park staff, and your company all want to see this product succeed because we all want a lightweight way to carry food."  SIBBG at 845.  When SIBBG studied the Ursack in 2004, it observed that "[t]here is some interest in this product since backpackers (especially the go-light types) generally don't want to carry unnecessary weight."  <u>Id.</u> at 45.

At critical points in the record, SIBBG members explicitly cited the possibility that Ursacks may improve compliance.  In November of 2006, SIBBG members conducted a vote via e-mail to determine how to treat three different Ursack models.  In voting

21

**United States District Court**
For the Northern District of California

to conditionally approve the V27 and the S29, Werner stated:

> I suspect that this product improves compliance,
> and I cannot help but wonder if the low number of
> incidents last summer [in 2006] was related to
> better compliance.  The only obvious difference in
> last year compared to previous years was the
> authorization to use Ursacks in canister-required
> areas.

Id. at 207.  The group nonetheless voted to test the Ursacks in-house rather than to allow the public to test them by issuing a conditional approval.  YOSE at 189-90.  Cohen was thereafter invited to SIBBG's spring meeting in 2007, where he clearly made this same compliance argument to SIBBG.  Id. at 309.  When SIBBG did not alter its determination and Ursack threatened suit, the Superintendent of SEKI proposed that SIBBG reconsider the matter, specifically because of the possibility that Ursacks may affect visitor compliance.  The Superintendent wrote:

> [W]e recognize that most wilderness users carry
> some form of portable bear-proof storage device;
> many of them dislike the weight of approved units.
> A lighter approved unit should improve compliance
> which is important to achieving our bear management
> objectives.

Id. at 175.

The record amply reflects that SIBBG members were aware of the impact that Ursacks may have on visitor compliance, and that they considered this argument in reaching their conclusion.  In fact, it suggests that the Ursacks made it so far in the approval process because of this consideration.  However, the record also reflects that many SIBBG members did not believe that the Ursacks were an effective way of protecting food from bears.  Whether container effectiveness should be sacrificed for the purpose of

22

United States District Court
For the Northern District of California

1   improving compliance is precisely the kind of determination that

2   is best left to agency expertise.  See Florida Manufactured Hous.

3   Ass'n, 53 F.3d at 1577.  SIBBG could reasonably conclude that the

4   best course was to encourage and require use of containers that

5   were more reliable than the S29.  Having satisfied itself that the

6   agency gave consideration to this important issue, the Court will

7   not second-guess SIBBG's conclusion.

8        **3.   SIBBG's Determination That There Were Six
              "Failures" and SIBBG's Definition of "Failure"**

9

10       Plaintiffs contend that SIBBG's determination was arbitrary

11  and capricious because they had no consistent definition of

12  "failure."  Ursack Reply at 5-6.  They state that the term

13  "'failure' remains a vaguely defined term subject to the whims of

14  SIBBG, which remains free to apply one standard to Ursack and

15  another to its competitors."  Id.  Plaintiffs liken this case to

16  Alaska State Snowmobile Ass'n v. Babbitt, 79 F. Supp. 2d 1116 (D.

17  Alaska 1999), in which a district court concluded that the NPS's

18  failure to define "traditional activities" made it impossible for

19  the court to conduct a proper APA review of the NPS's

20  determination.  Id.

21       Although SIBBG's testing standards do not explicitly define

22  the term "failure," they do state that:

23           Revocation of a products' [sic] approval may occur
             at any time based upon SIBBG consensus in response
24           to the field evaluation of the container.  This may
             include evidence that bears have mastered the
25           container/device, use which results in
             environmental damage, common misuse by users of the
26           method or device, or structural failure due to
             elements of weather or exposure.

27

28

                                    23

United States District Court
For the Northern District of California

SIBBG at 748.  The Court reads this as a reasonable indicator of what SIBBG understood to constitute a "failure."

Plaintiffs devote much of their discussion to arguing that SIBBG's notion of "failure" was slippery and ill-defined.  See, e.g., Ursack Reply at 5-6.  The record reflects that SIBBG was well aware of the potential difficulties that they faced in creating objective testing standards, and there was substantial discussion within SIBBG, and between SIBBG and Ursack, regarding exactly what should constitute a "failure" for soft-sided containers.  SIBBG clearly recognized that the Ursacks "present a variety of issues that do not exist for hard-side units (e.g., [t]hey can be carried off if not secured to something sturdy; they don't protect fragile food from being crushed or protect liquids from leaking out of the Ursack; attaching them to trees may cause damage to trees; etc.)."  SIBBG at 575.  In an e-mail to Cohen, Werner explained that "[h]ard-sided units either break or they don't.  Soft-sided units with small punctures seem to fall into a grey zone that has led to us interpreting the same results different in the past."  Id. at 867.  The record therefore reflects that SIBBG reasonably determined that soft-sided containers faced additional concerns not presented by hard-sided containers, and could therefore be subject to a broader standard for "failure."

Plaintiffs claim that SIBBG never explicitly stated this

24

broader standard of "failure."[8]  Ursack Reply at 5-6.  The Court

finds this to be irrelevant, because when SIBBG concluded that

there were six reported failures, five of the six failures were

situations that were explicitly listed by SIBBG's protocol as a

basis for revocation.  Id. at 302.  SIBBG therefore did not need

to invoke a broader definition of "failure" than that used for

hard-sided containers.  Five of these failures involved either a

bear that "mastered" the device by extracting food, or (as Ursack

contends) "misuse by users," see id., both of which are named by

SIBBG's testing protocol as grounds for revocation of conditional

approval, id. at 748.  Thus, SIBBG did not need to (or claim to)

apply a special definition of "failure" when it concluded that the

S29 had suffered from more than three failures.

In the sixth reported failure, a mouse chewed a hole into an

Ursack and accessed the food inside.  YOSE at 169.  Plaintiffs

contend that this should not have been considered a "failure"

---

[8] The Court will assume that this is true.  SIBBG did state a
clear standard for "failure" in its April 10, 2007 Briefing
Statement, which was circulated internally within SIBBG.  YOSE at
191-92.  The Statement provides that: "A failure constitutes a
container that is lost or abandoned, if the food inside is no
longer edible after an encounter with an animal, if an animal
receives a food reward/the fabric is compromised, and/or the
container presents a safety hazard to humans or wildlife."  Id. at
192.  All six reported "failures" clearly meet this definition.
Plaintiff claims that this definition is invalid because the record
does not indicate that it was ever published or shared with Ursack
(indeed, it appears to have been restricted because of Ursack's
litigation threats.  Ursack Reply at 3.  Plaintiffs do not provide
a legal basis for their contention that SIBBG needed to publish
these standards.  The Court need not reach the propriety of the
standards articulated in the briefing statement, however, because
it concludes that even if SIBBG had failed to articulate separate
standards for soft-sided containers, its decision was not arbitrary
and capricious given the nature of the failures that were reported.

United States District Court
For the Northern District of California

since it did not constitute "evidence that *bears* have mastered the container." Ursack Reply at 5.  However, the record explains why individual SIBBG members believed this to be a "failure."  Members of SIBBG had previously expressed a concern that rodents could weaken the bag for future bear encounters.  SIBBG at 529.  In addition, at least one member of SIBBG stated that food-storage methods that could not protect against other animals were still inconsistent "with 'Keeping Wildlife Wild' principles. . . .  We note that while most agree the high bar for a hard-sided container is a bear, the high bar to a bag may be a rodent."  SIBBG at 231.  In light of these concerns, SIBBG's characterization of this incident as a failure was reasonable.[9]

In short, SIBBG gave considerable thought to the definition of "failure" for soft-sided containers, but the evident challenge of defining this term did not result in an arbitrary or capricious decision in this case.  The criteria for revocation included in SIBBG's testing protocols, and the broader record relating to SIBBG's consideration of this issue, provide the Court with a sufficient standard to evaluate SIBBG's conclusion.  The Court finds this conclusion to be far from arbitrary or capricious.

_____

[9] Plaintiffs also mention that one of the Ursack failures was tested by a Yosemite Wildlife Biologist in Yosemite Valley, an area that does not even allow hard-sided containers and requires all visitors to store food in storage lockers.  Ursack Mot. at 14-15. Plaintiffs do not develop this point, but they seem to suggest that this test shouldn't "count" just because it took place in an area where visitors could not use canisters.  They do not suggest that conditions in Yosemite Valley were in any way different from those that the Ursacks would normally face when used by the public, or why it would be unreasonable to consider this a "failure."  As such, the Court defers to SIBBG's finding that this bear incident constitutes an S29 failure.

United States District Court
For the Northern District of California

1        **4.   <u>SIBBG's Determination that Ursack Could Not Be Tied</u>**
         **<u>to Trees</u>**

2

3        Plaintiffs next contend that SIBBG acted capriciously by

4   determining that Ursacks had to be used the same way as "free

5   standing" bear containers, and could not be tied to trees or

6   rocks.  Ursack Mot. at 13.  Plaintiffs contend that this prevented

7   backpackers from using the S29s as intended, which lessened their

8   effectiveness during the public trials and led "directly to

9   several alleged Ursack failures in 2007."  <u>Id.</u> at 14.

10       Tying food to trees is permitted and even required in certain

11  areas of the parks and forests.  <u>See</u>, <u>e.g.</u>, 36 C.F.R. 2.10(d).

12  However, bear-resistant containers, with the exception of Ursacks,

13  are not typically tied to trees, and the parks have explicitly

14  prohibited the practice of tying food to trees as a method of food

15  protection in areas where bear-resistant containers are required.

16  <u>See</u> YOSE at 269 ("All other food storage systems are prohibited in

17  the designated area."); SEKI at 254 ("The technique of

18  counterbalancing or hanging food . . . [is] prohibited within the

19  restricted areas . . . .").  Communications between SIBBG and

20  Ursack reflect that at the time SIBBG was reviewing the Ursacks,

21  it "really want[ed] to move away from storing anything in trees."

22  SIBBG at 958.  When SIBBG conditionally approved the S29 in 2007,

23  it ultimately decided that the Ursacks "must not be tied to trees

24  or rocks.  It has to be used like any other portable food-storage

25

26

27

28

**United States District Court**
For the Northern District of California

1   product."   YOSE at 182.[10]

2       Although SIBBG did not explicitly describe its reasons for

3   this restriction in 2007, it had previously imposed similar

4   restrictions, and had thoroughly explained its reasoning at that

5   time.   When SIBBG declined to approve the Ursacks after its 2004

6   testing, the first reason it cited was the cumulative damage that

7   the bags could inflict upon the trees that they were tied to.   Id.

8   at 901, 904-05.   In response, Ursack retained a silviculture

9   specialist from the University of California, Dr. Kevin O'Hara, to

10  opine on the extent of the damage; he wrote in a letter to SIBBG

11  that an "Ursack's effect on the natural environment would

12  approximate the routine disturbance" of bark and soil caused by

13  wild bears.   Id. at 906-08.   Werner's reasoned response to Dr.

14  O'Hara's opinion, in an e-mail dated November 11, 2004, explained

15  that even if the damage caused by the Ursacks was similar in scope

16  _____

17      [10] Plaintiffs contend that, as of October 6, 2005, "SIBBG
    determined that campers must clearly be advised permitting the
18  be tied to trees." Ursack Mot. at 13.   This is misleading.
    Plaintiffs cite to a portion of the record that only shows that
    SIBBG was concerned about Ursack's instructions that the bags be
19  tied to branches.   When SIBBG was discussing approval during the
    October 6, 2005 meeting (but not actually granting approval), the
20  meeting minutes state:   "According to tag, user can tie Ursack to
    branch -- we need to make sure that it is clear that it can only be
21  approved for use if it is tied to the trunk."   SIBBG at 789.   These
    minutes suggest that SIBBG briefly anticipated permitting the
22  Ursack to be tied to tree trunks for the 2006 season.   However,
    later portions of the record indicate that when SIBBG actually
23  granted conditional approval for 2006, it prohibited tying Ursacks
    to anything in restricted areas.   Shortly after the October 6, 2005
24  meeting, and after the V21s were granted conditional approval for
    2006, a communication between Werner and Cohen recounts that "SIBBG
25  parks do not want them tied to trees or rocks," and the two discuss
    the instructions that Ursack should include to account for this
26  restriction.   Id. at 958-959.   Contrary to Plaintiffs'
    characterization, SIBBG never held the position that the Ursacks
27  must be tied to trees.

28                                    28

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

to "natural" disturbances caused by bears, SIBBG had made a policy determination to distinguish between natural and human-induced disturbances and wildlife behaviors.  Id. at 911-12.  Even if bears damage trees without Ursacks, when a bear damages a tree during an Ursack encounter, "[t]he basic cause [of the damage] is anthropogenic, not natural.  This should not be compared to bears ripping apart logs or rolling rocks to forage for natural food." Id. at 911.  As Werner explained, this distinction is reasonable in light of the agency's reading of NPS's directive that wildernesses "be administered . . . as will leave them unimpaired," and the definition of wilderness as "untrammeled by man" and "retaining its primeval character and influence."  Id. (quoting 16 U.S.C. §§ 1131-1136).  The Court finds that SIBBG had a reasonable basis for making this determination.

Of course, Ursacks (and all other containers) could still be tied to trees in areas without food-storage restrictions, where counterbalancing is not prohibited.  Plaintiffs argue that this is inconsistent:  "Either tying a bear bag to a tree harms the environment or it does not."  Ursack Reply at 11.  However, the fact that there are different use restrictions in different areas of the parks does not render unreasonable SIBBG's decision to restrict the use of Ursacks within restricted areas.  Plaintiffs' argument amounts to little more than an assertion that "all evils of the same genus [must] be eradicated or none at all."  C.f. Railway Express Agency, Inc. v. New York, 336 U.S. 106, 110 (1949) (rejecting proposition in equal protection context). Administrative agencies are permitted to take a nuanced approach

when facing a variety of competing and conflicting problems. An administrative decision is not arbitrary and capricious merely because it does not eradicate a problem by a single stroke, or because it tolerates the problem in certain contexts. <u>See Louisiana ex rel. Guste v. Verity</u>, 853 F.2d 322, 332 (5th Cir. 1988) (rejecting "novel proposition that regulations failing to address all of the causes of a problem are, for that reason, arbitrary and capricious. . . . [This proposition] ignore[s] the well established rule that regulations need not remedy all evils, or none").

**D.   <u>Whether SIBBG Violated Ursacks' Due Process Rights</u>**

Plaintiffs contend that SIBBG denied Ursack its due process rights by denying it the opportunity to challenge the evidence that supported SIBBG's decision to rescind conditional approval, i.e., the reported S29 failures that took place in 2007. Plaintiffs primarily argue that SIBBG violated 5 U.S.C. § 558(c), which requires "an opportunity to demonstrate or achieve compliance with all lawful requirements" before a license is withdrawn.  Ursack Mot. at 16.  Defendants oppose this statutory due process argument, and also seek summary judgment on the question of Plaintiffs' constitutional due process claims, Defs.' Mot. at 16-19, which were raised in Plaintiffs' Complaint, Compl. §§ 68-75.

**1.   <u>Whether Conditional Approval Was a "License"</u>**

Plaintiffs first argue that SIBBG's conditional approval of the S29 for 2007 was a "license" as defined by the APA.  Ursack Mot. at 16.  If so, then 5 U.S.C. § 558(c) requires the agency to

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

grant Ursack notice and "an opportunity to demonstrate or achieve compliance with all lawful requirements" before the license is subject to "withdrawal, suspension, revocation, or annulment."[11] The record indicates that Cohen engaged in frequent, informal communication with SIBBG members and did in fact know of and contest many of the failure reports that SIBBG received throughout the 2007 season.  <u>See</u>, <u>e.g.</u>, SIBBG at 167.  However, Defendants do not claim that this amounted to an "opportunity to demonstrate compliance" under § 558(c); rather, Defendants argue that SIBBG's conditional approval was never a "license" as the term is used by the APA, but was instead a "resource management decision that regulated the use of the National Parks and National Forest by visitors."  Defs.' Mot. at 17.  Therefore, according to Defendants, § 558(c) did not apply.

At first glance, Defendants face something of an uphill battle.  The APA defines a license as "including the whole or a part of an agency . . . approval . . . ."  5 U.S.C. 551(8).[12]  "The definition of license in the APA is extremely broad."  <u>Air North America v. Dept. of Transp.</u>, 937 F.2d 1427, 1436-38 (9th Cir. 1991).  Courts have read the term to include various types of certificates and approvals:

---

[11] Plaintiffs have not claimed that § 558(c), or any other provision, entitles Ursack to a hearing as part of the process of applying for a license.  They only claim that they were entitled to a hearing as to the basis for withdrawal.

[12] "'[L]icense' includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  5 U.S.C. § 551(8).

United States District Court
For the Northern District of California

1

2

3

4

5

6
> In other cases, courts have determined that the
> language was broad enough to cover a permit to
> graze on national forest land, to "specifically
> approved stockyard" status under the Cattle
> Contagious Diseases Act; to veterinarian
> accreditation; to designation by the Immigration
> and Naturalization Service of a facility as an
> approved laboratory for conducting medical
> examination; and to approval granted to an
> institution of higher learning authorizing entry of
> nonimmigrant alien students for study; among
> others.

7

8  Horn Farms, Inc. v. Veneman, 319 F. Supp. 2d 902, 922 (N.D. Ind.

9  2004), rev'd by 397 F.3d 472 (7th Cir.) (citations omitted)

10 (collecting cases).

11     After reviewing the unique and particular facts of this case,

12 the testing protocol that SIBBG had established, and the specific

13 context in which SIBBG issued its conditional approval of the S29,

14 the Court concludes that the APA did not entitle Ursack to notice

15 and a hearing prior to SIBBG's termination of conditional approval

16 for the S29, for two independent reasons.[13]

17     First, the Court finds that, in spite of the "extremely

18 broad" definition of license under the APA, the unique facts of

19

20     [13] In so finding, the Court will assume, contrary to
Defendants' claims, that full approval of a bear-resistant

21 container would constitute a "license" under the APA, even though
the parks and forest are actually just approving the containers for

22 use by visitors within their land, and are not directly granting
the manufacturers permission to do anything. C.f. Horn Farms, Inc.

23 v. Johanns, 397 F.3d 472, 478-79 (7th Cir. 2005) (finding no
"license" application where plaintiff "does not need any federal

24 official's permission under [16 U.S.C.S. §§ 3821-24] either to
engage in farming or to drain wetlands. It is free to do as much of

25 either as it wants (subject to other legal constraints)"); but see
New York Pathological & X-Ray Labs., Inc. v. Immigration and

26 Naturalization Service, 523 F.2d 79 (2d Cir. 1975) (finding
withdrawal of "license," where Immigration and Naturalization

27 Service removed designation of laboratory as approved to conduct
examinations of certain aliens seeking permanent resident status).

28

United States District Court
For the Northern District of California

this case make SIBBG's 2007 conditional approval of the S29 an ill

fit for a "license."  SIBBG's testing protocol makes it clear that

"conditional approval" is no guarantee of "approval" -- rather, it

only entitles the container to a "field evaluation," which serves

as another stage of testing "which the container must successfully

complete before it is considered to be 'approved.'"  SIBBG at 745.

"If, at any point during the field evaluation, the container is

unsuccessful, conditional approval will be rescinded . . . ."  Id.

at 748.  Notably, SIBBG's treatment of the S29 was even more

explicitly a "testing stage" than most conditional approvals.

After SIBBG voted to test the S29 in-house, rather than allow the

public to test it through a conditional approval, Ursack

threatened to bring suit, and only then did SEKI respond that it

was "willing to entertain being a test area for the S29 by the

public under park 'conditional approval' to help fulfill the

testing that SIBBG voted to accomplish while also giving a wider

market to Ursack to help defer their R&D expenses."  YOSE at 185.

It would therefore be a distortion to claim that the S29s were

"approved" for anything more than public tests, in lieu of in-

house testing.  See id. at 192.

     Under the narrow facts presented by this case, where an

agency tentatively allows the public to use a product only as a

means of testing the product to determine whether it is

appropriate for "approval," at the applicant's insistence and as

an alternative to in-house testing, then there has not been

"approval" under the APA.  Instead, SIBBG's grant and withdrawal

of conditional approval for the S29 is most aptly characterized as

33

a failed license application, rather than the withdrawal of a prior APA "license."  Withdrawal of conditional approval for the S29 therefore did not implicate the notice and hearing requirements of § 558(c).

Second, even assuming that the conditional approval was a "license" as understood by § 551(8), it was a conditional license that expired according to its own terms, and was not subject to "withdrawal, suspension, revocation, or annulment" so as to trigger § 528(c).  This was the conclusion reached by one circuit court that determined that a particular "conditional approval" was a "license" as defined by the APA.  In <u>Atlantic Richfield Co. v United States</u>, 774 F2d 1193, (D.C. Cir. 1985) (hereinafter "<u>ARCO</u>"), the Maritime Administration ("MA") had conditionally approved requests by two shippers to engage in domestic trade with their subsidized vessels.  Shippers that operate subsidized vessels were normally restricted to international shipping, and barred from domestic trade; however, if the MA determined that suitable domestic vessels were unavailable to carry domestic cargo, the MA could approve the use of a subsidized vessel for that purpose.  <u>Id.</u> at 1195-96.  In <u>ARCO</u>, the MA had granted approval, subject to the condition that approval would terminate "if any one of four unsubsidized [i.e., domestic] ships were not 'fixed for suitable employment' when their charters expired."  <u>Id.</u> at 1197.  After several months, the MA noted that two domestic ships were not "fixed for suitable employment," and it terminated the subsidized shippers' approval.  <u>Id.</u>  The subsidized shippers brought suit against the MA, claiming that they were entitled to a

United States District Court
For the Northern District of California

hearing under § 558(c) to challenge whether the domestic ships were in fact "fixed for suitable employment," or whether they had instead willfully turned down suitable employment.  Id.  The circuit panel concluded that the conditional approval was a "license" within the broad definition of the APA.[14]  Id. at 1200. However, the panel also concluded that the shippers were not entitled to a hearing, because the license was not subject to "withdrawal, suspension, revocation, or annulment" are required by § 558(c).  Id. at 1200-02.  Rather, the approval had expired on its own terms.  Id.   A hearing would have been fruitless because the record indicated that the condition of "suitable employment" was unqualified (i.e., it didn't matter if the domestic shippers had passed up other employment opportunities), the subsidized shippers could do nothing to affect or change the condition, and there was no dispute that the domestic shippers were, in fact, available for employment.  Id.

As previously discussed, SIBBG's testing protocol specifically states that "conditional approval" would be revoked if there is "evidence that bears have mastered the container/device, use which results in environmental damage, common misuse by users of the method or device, or structural failure due to elements of weather or exposure."  SIBBG at 748. With respect to the S29, the SIBBG explicitly stated that three failures would result in the revocation of conditional approval.

---

[14] The Court notes that this conclusion is distinguishable from the "conditional approval" at issue in this case, for the reasons stated above.  Namely, unlike the MA's conditional approval, SIBBG's "approval" was nothing more than a public testing phase.

United States District Court

For the Northern District of California

1  YOSE at 185, 192.  Six failures were reported to SIBBG -- at that

2  point, the license expired on its own terms, and Ursack is not

3  entitled to a hearing under § 558(c).  See ARCO, 774 F.2d at 1200.

4  As in ARCO, the purpose of the hearings that the Plaintiffs now

5  seek would be irrelevant to the conditions at play.  By their

6  pleadings, Plaintiffs indicate that Ursack would use these

7  hearings to challenge the evidence and show that several of the

8  "failures" were actually the fault of the user.  See Ursack Mot.

9  at 15.  However, SIBBG has never indicated that a bear receiving

10  food due to "user error" is any less a "failure" than a bear that

11  receives food from a properly-tied unit.[15]  This is similar to

12  ARCO, where the Plaintiffs sought to challenge the circumstances

13  surrounding the domestic shippers' lack of "suitable employment,"

14  even though these circumstances where irrelevant to the conditions

15  set by the MA.  The Court finds that § 558(c) did not require

16  notice or a type of hearing before conditional approval of the S29

17  was rescinded.

18         **2.    Whether SIBBG Violated Plaintiffs' Constitutional**
              **Due Process Rights**

19

20         Defendants have sought summary judgment as to Plaintiffs'

21

22         [15] As previously noted, SIBBG did distinguish "user-error
23  failures" from other failures when it conditionally approved the
   Ursacks for 2002.  It stated that approval may be revoked if bears
24  gain access to bags on three separate occasions when the bag is
   used correctly, or on five occasions when used incorrectly.  SIBBG
25  at 820.  Even in this instance, a user error was still considered a
   "failure."  In contrast to the 2002 conditional approval, in 2007
26  SIBBG did not give any distinct treatment to failures caused by
   user error.  SIBBG at 747-48; YOSE at 192.  Plaintiffs provide no
27  compelling reason why such instances may not reasonably be
   considered "failures."

28

constitutional due process claims as well.  Defs.' Mot. at 16-19.
Plaintiffs claim that revocation of the S29's conditional approval
violated the Plaintiffs' due process rights under the Fifth
Amendment of the Constitution.  Compl. ¶ 71.  The Fifth Amendment
holds: "No person shall be . . . deprived of life, liberty, or
property, without due process of law."  Plaintiffs claim that
their interest in the conditional approval was a property
interest.  <u>Id.</u>

A "procedural due process claim hinges on proof of two
elements: (1) a protectable liberty or property interest in
obtaining the permit; and (2) a denial of adequate procedural
protections."  <u>Foss v. Nat'l Marine Fisheries Serv.</u>, 161 F.3d 584,
588 (9th Cir. 1998).  Plaintiffs will have a protectable liberty
interest if they can show "a legitimate claim of entitlement" that
stems from an independent source (such as state law) as opposed to
a "unilateral expectation" or an "abstract need or desire for it."
<u>Board of Regents v. Roth</u>, 408 U.S. 564, 569-71 (1972).  Where a
decision maker has discretion over the conferral of a benefit,
this indicates that there is no entitlement to the benefit.  <u>See</u>,
<u>e.g.</u>, <u>Thornton v. City of St. Helens</u>, 425 F.3d 1158, 1164-65 (9th
Cir. 2005) (describing test as spectrum, with property interest
and no discretion at one end, and total discretion but no property
interest at other).  For example, "an applicant does not have a
property interest in the renewal of a license if the reviewing
body has discretion to deny renewal or to impose licensing
criteria of its own creation."  <u>Id.</u>  The question therefore turns
on whether a law or regulation restricts SIBBG's discretion with

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

respect to conferring approval on bear-resistant containers. <u>Id.</u>

Plaintiffs can cite to no law or regulation that restricts SIBBG's discretion when approving or testing bear-resistant canisters. They can point only to the testing protocols established by SIBBG itself. SIBBG at 744; YOSE at 192. However, criteria formulated and articulated by the decision maker, if it is not elevated to the level of law by statute or regulation, does not create a legal entitlement sufficient to establish a constitutionally-protectable property interest. <u>See Morley's Auto Body v. Hunter</u>, 70 F.3d 1209, 1214 (11th Cir. 1995) (rejecting plaintiff's argument that sheriff's detailed written "wrecker rotation policy" created property interest for inclusion on wrecker rotation list, "because there is no Florida state law authority that elevates that policy to the status of a regulation with the force of law"). The Ninth Circuit has stated on several occasions that "[t]here is no protected property interest if 'the reviewing body has discretion . . . to impose licensing criteria of its own creation.'" <u>Shanks v. Dressel</u>, 540 F.3d 1082, 1091 (9th Cir. 2008) (quoting <u>Thornton</u>, 425 F.3d at 1165 (9th Cir. 2005)); <u>see also Pinnacle Armor, Inc. v. United States</u>, 2008 U.S. Dist. LEXIS 23109, at *19 (finding no property interest in remaining on list of approved bullet-proof vests, where National Institute of Justice maintained list according to its own requirements, which gave it broad discretion). SIBBG's policies clearly do not carry the force of law. SIBBG's authority comes from a memorandum of understanding between NPS and USFS officials, which makes no mention of any conferral or delegation of

38

regulatory authority, and indeed, does not even commit NPS or USFS officials to finally approve the containers that SIBBG has approved.[16]   SIBBG at 2-5.

In addition, Plaintiffs may not claim a property interest that had been "based on the conduct and representations of government officials when their actions lead to the creation of a 'mutually explicit understanding.'"  Thornton, 425 F.3d at 1164-65.  SIBBG explicitly used the conditional approval process as a testing phase, and the record contains no guarantees that SIBBG would finally approve any product that it conditionally approved. Instead, the testing protocols explicitly state that SIBBG may rescind even final approval due to "successive product failures."[17] SIBBG at 748.  This does not amount to a "mutually explicit understanding."  C.f., Lucas v. Monroe County, 203 F.3d 964, 978 (6th Cir. 2000) (holding that written policies of sheriff's department, even if unfair, do not create claim of entitlement where they "explicitly provide that a wrecker company may be immediately removed from the list" upon certain conditions).

**E.   Equal Protection**

Plaintiffs claim that Defendants' actions have violated the

---

[16]  Indeed, SIBBG's discretion is arguably irrelevant, given the fact that NPS and USFS officials are actually the ones to make the ultimate legal decision as to which containers are approved for use in which parks or forests.  This makes Plaintiffs' due process claims even weaker, as NPS and USFS officials apparently have no restrictions on their discretion, self-imposed or otherwise.

[17]  It is also worth noting that Plaintiffs base many of their other arguments on the discretion afforded by SIBBG's policies, and the "impenetrable vagueness" of their standards.  See, e.g., Ursack Mot. at 19.  This undercuts Plaintiffs' claim that there had been a "mutually explicit understanding."

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Equal Protection Clause of the Fourteenth Amendment, as applied to the Federal Government via the Fifth Amendment.  Ursack Mot. at 17-19.  They claim that SIBBG privileges some businesses over others, because "SIBBG's unwritten failure standard distinguishes between Ursack, a soft-sided canister and manufacturers of hard-sided canisters (e.g., BearVault)."  Id. at 18.  Plaintiffs concede that manufacturers of soft-sided containers are not a protected class.  See id.  As such, the Court will apply a rational basis test to determine if there is, at least, a loose but reasonable "fit" between legislative objectives and methods used to meet those objectives.  See, e.g., Cornwell v. Hamilton, 80 F. Supp. 2d 1101, 1106 (S.D. Cal. 1999).

The Court finds no basis for Plaintiffs' argument that hard-sided and soft-sided containers, or their manufacturers, are similarly situated or should be subject to identical standards. Stated otherwise, the Court finds a rational basis for different treatment.  The record is replete with thoughtful and convincing explanations as to why soft-sided containers must be subject to different considerations than hard-sided containers, as the Court described in Part IV.A.3, supra.  Notably, Cohen himself once complained that SIBBG had "impermissibly applied a hard-container standard to a soft-sided container.  It's apples to oranges." SIBBG at 831.

As to Plaintiffs' repeated comparisons between the S29 and BearVault (which failed as many as thirteen times, primarily in one location), the Court has already addressed this in Part IV.A.1., supra, and now concludes that there was a rational basis

40

1  for treating a container that failed continuously in one location

2  (BearVault) differently from a container that failed continuously

3  throughout the region (Ursack).

4  **F.   The Federal Advisory Committee Act ("FACA")**

5      In their Complaint, Plaintiffs claim that "the SIBBG was

6  established and/or utilized by Defendants in violation of" FACA,

7  for "failure to be formally recognized by [the] head[s] of" the

8  NPS and USFS and "failure to conduct open meetings."  Compl.

9  ¶¶ 79. However, the cited portions of FACA apply only to "advisory

10 committees," 5 U.S.C. App. III, §§ 9-10, and an agency is not an

11 "advisory committee" if it "is composed wholly of full-time, or

12 permanent part-time, officers or employees of the Federal

13 Government."  5 U.S.C. App. III, § 3(2)(i).  The record contains

14 no evidence that SIBBG contained anyone who was not a federal

15 employee, and the Memorandum of Understanding that created SIBBG

16 refers only to federal employees.  SIBBG at 2-5.  Plaintiffs' only

17 response is to point to several non-federal employees who were

18 occasionally present at SIBBG meetings.  Ursack Reply at 17.

19 However, the bare fact that non-federal employees attended SIBBG

20 meetings, without more, does not even raise a question of fact as

21 to the composition of SIBBG.  See In re Cheney, 406 F.3d 723, 728

22 (D.C. Cir. 2005) ("Congress could not have meant that

23 participation in committee meetings or activities, even

24 influential participation, would be enough to make someone a

25 member of the committee.").  Cohen himself attended a meeting to

26 represent Ursack, SIBBG at 224, but does not purport to be a

27 member of SIBBG.  Based solely on Plaintiffs' allegations, no

28

United States District Court
For the Northern District of California

41

reasonable jury could conclude that SIBBG was an advisory committee.  Based on the record before the Court and the allegations of the parties, the Court holds that FACA does not apply to SIBBG.

**V.    <u>CONCLUSION</u>**

For the reasons stated above, the Court GRANTS Defendants' Motion and DENIES Plaintiffs' Motion.  Judgment shall be entered in favor of Defendants and the case is hereby DISMISSED.

IT IS SO ORDERED.

August 6, 2009

_____

UNITED STATES DISTRICT JUDGE